# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| ROBERT RINEARSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No. 1:17-CV-441-HAB ) |
| FORT WAYNE COMMUNITY SCHOOLS, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter comes before the Court on Defendant Fort Wayne Community Schools' ("FWCS") Motion for Summary Judgment (ECF No. 30) and its supporting Memorandum of Law (ECF No. 31). The issue presented in the summary judgment filings is whether Plaintiff Robert Rinearson ("Rinearson") was fired from his position with FWCS due to his verbal intimidation of, and physical contact with, a nine-year-old female student, or due to a guest column he penned for his local newspaper in support of law enforcement.[1] This Court finds that Rinearson has designated no evidence that could lead a reasonable jury to find that his firing was the result of the latter, and therefore summary judgment will be entered in favor of FWCS.[2]

---

[1] Defendant also filed a Motion to Strike (ECF No. 42). Defendant bases its Motion to Strike on hearsay grounds and on a claimed lack of foundation. Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies Defendant's Motion to Strike. The Court has noted Defendant's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

[2] FWCS also moved for summary judgment on Rinearson's claim under the Indiana Constitution. Rinearson has abandoned that claim in his Memorandum of Law in Response (ECF No. 38 at 4, n.1), and therefore the Court will enter summary judgment on that claim as well.

# FACTUAL BACKGROUND

A. *Rinearson's Treatment of Students in his Care*

Rinearson worked for FWCS for a total of twenty-one years, the last seventeen of which he served as the Supervisor of Safety and Student Management for FWCS' transportation department. Rinearson's job responsibilities included a wide range of tasks including training bus drivers and, when required, personally appearing on-scene to assist bus drivers with disruptive students.

There appears to have been a disconnect between Rinearson's instructions during training and his actions when he was called upon to put that training into action. On the training side, Rinearson focused on de-escalating encounters with students. This meant that, with limited exceptions, bus drivers were not to yell at students, and they were never to intimidate or scare students. Once an incident had been de-escalated, Rinearson taught drivers to take a positive approach with the student involved. Physical force was only to be used against students when they posed a danger to themselves or others. These teachings were in accordance with FWCS' policies, which focused on the well-being of students and emphasized a student's right to be treated with "dignity and respect."

Unfortunately, it appears that Rinearson rarely practiced what he preached. This is highlighted by two events during the Spring of 2017. On March 16, 2017, Rinearson was called to respond to a report of an unruly student on a bus. By the time Rinearson arrived, the situation had calmed to the point that Rinearson could not determine which child needed correction; the bus driver had to identify the student that had caused the problem. What transpired next was captured on a security camera located inside the bus. Rinearson proceeded to corner the student, estimated to be an eighth-grade boy, against the bus seat and yell mere inches from the student's face. Among

the variety of invectives hurled by Rinearson was an apparent threat to fight the child; Rinearson screamed, "let's go" and indicated that he wanted to "take [the child] outside." At this point the student began to cry, which prompted Rinearson to tell him to "stop acting like a baby." Throughout the interaction the child is upset.

Rinearson's yelling and screaming were so loud that they drew the attention of nearby residents. One such resident recorded Rinearson's conduct on his phone, and subsequently uploaded the video to the web service YouTube. The video apparently achieved some amount of viral internet fame.

When he learned that the video had been uploaded to the internet, Rinearson informed Krista Stockman ("Stockman"), who handled public relations for FWCS. Stockman told Rinearson to "be careful." The situation also came to the attention of Charles Cammack ("Cammack"), FWCS' Chief Operating Officer. Cammack instructed Rinearson's supervisor, Frank Jackson ("Jackson"), to tell Rinearson that his actions were unacceptable. The parties dispute whether Jackson ever relayed this message.

A similar event occurred on May 25, 2017. Again, Rinearson was called to address a report of an unruly student and, again, the situation had resolved itself by the time Rinearson arrived. When the student was identified by the bus driver, Rinearson immediately began yelling at the child. Rinearson informed the child that he was going to "make it real hard" on her and ordered her off of the bus. Although the child was visibly upset by Rinearson's conduct, she complied with Rinearson's command and exited the bus without incident. Again, Rinearson's conduct was captured by a security camera located on the bus.

Once the child exited the bus, the events were recorded by security cameras at the school where the bus was stopped. Rinearson and the child are seen entering the exterior doors to the

school. The student began "slow walking" between the exterior and interior doors, and then stopped completely. While the parties dispute how to characterize Rinearson's subsequent actions, it is undisputed that he physically contacts the child to assure her complete entry into the school. The child repeatedly objects and asks Rinearson to keep his hands off her.

Rinearson's actions in and around the area of the doors was witnessed by two FWCS employees: Dottie Davis ("Davis"), FWCS' Director of Security; and Diane Pelkington ("Pelkington"), the school's principal. Davis believed that Rinearson acted inappropriately because he was aggressive with the child and used unnecessary force. Pelkington also described Rinearson's conduct as "aggressive," and stated that the situation was "attention getting," "ugly," and "not pretty." Both women described the child as upset and crying.

Davis reported her concerns to Cammack. Cammack instructed Davis to prepare a written statement, and then turned the matter over to Kathy Carr ("Carr"), FWCS' Director of Human Resources, to investigate. Carr interviewed witnesses, reviewed videos of both incidents, and spoke with Jackson. Carr credited the accounts of Davis and Pelkington and was particularly concerned by Rinearson's treatment of the girl on the bus. Carr believed that Rinearson's use of force on the girl was premeditated, as evidenced by his remark that he would "make it real had" on her. Jackson shared Carr's concerns, particularly regarding Rinearson's escalation of the situation, his verbal intimidation of the child, and his unnecessary physical force.

Following their review, Jackson and Carr determined that Rinearson should be terminated, and reported that recommendation to Cammack. Cammack concurred, so he and Carr met with Dr. Wendy Robinson ("Robinson"), FWCS' Superintendent, to convey the recommendation. As she had with every other termination recommendation during her tenure, Robinson agreed and forwarded the recommendation to the school board. The school board approved the termination

recommendation, and Rinearson was fired. The designated evidence indicates that Rinearson was suspended on May 25, 2017, and terminated on June 5, 2017.

For his part, Rinearson largely does not contest the fact of what occurred during the March and May incidents, but instead challenges the interpretation of those incidents. Rinearson argues that nothing he did violated any FWCS policy. In support, Rinearson tenders not only his affidavit, but numerous other affidavits from police officers, former FWCS administrators, and bus drivers all attesting that Rinearson's actions were not inappropriate. Moreover, Rinearson's actions were apparently business as usual. According to Rinearson, these incidents were indicative of how he had handled similar situations for years; videos of similar events were reviewed by Rinearson, Jackson, and Cammack up to fifty times per year during Rinearson's tenure. In short, Rinearson views these incidents as little more than evidence of his "old school" approach to student discipline.

**B.** *Plaintiff's Political Writings*

Separate from his role with FWCS, Plaintiff was a regular contributor to the editorial pages of the Fort Wayne News-Sentinel newspaper, having written editorials for nearly thirty years. From January 1, 2013, through May 2017, Rinearson wrote some twenty-five articles covering a wide range of topics. These included:

- *Chaos Rules When Heroes Go Off the Stage, and the Clowns Go On* – advocating for gun rights through a discussion of evil clowns throughout history;
- *Lack of Presidential Leadership is Making Us All Feel Vulnerable* – criticizing President Obama for focusing on his golf game instead of various world crises;
- *If the Kids Won't Eat It, Your Good Intentions Will All Be for Naught* – arguing against Michelle Obama's National School Lunch Program because kids don't eat healthy food;

5

- *Police Aren't Waging War but are Expected to Enter War Zones* – advocating for an increase in military equipment for local law enforcement;

- *If We Start Blocking Some Opinions, Who Gets to Decide?* – criticizing censorship of unpopular opinions by comparing student protestors to Josef Stalin;

- *Authority Doesn't Mean Much to Many Young People Today* – bemoaning the lack of respect for teachers shown by students;

- *Don't Succumb to False Narrative of Racial Bias in Police Shootings* – noting that gang-related shooting deaths out-numbered police shooting deaths;

- *Another Way to Demean Votes* – criticizing the media for reporting that most college-educated voters voted for Hilary Clinton; and

- *Take Warning, Conservatives: Progressives Will Not Give Up* – warning against conservative complacency against "subversive leftist organizations" after President Trump's election.

(*See*, *e.g.*, ECF No. 30-11).

Rinearson's writings continued in the months preceding his termination. On January 12, 2017, Rinearson penned the article *President Obama Shares the Blame for Violence*. This article argued that President Obama's support for progressive groups generally, and Black Lives Matter specifically, was partially to blame for the nation's drug and violence problems. The thrust of the article was that the President's support for these groups advanced a "false narrative" of racially biased police shootings that caused law enforcement to back off from proactive policing in America's inner cities. (ECF No. 38-7).

On May 22, 2017, Rinearson wrote an article titled *When We Won't Help Police, the Criminals Will Rule*. Through an imagined interaction between a crime victim and an officer

during which the victim refuses to aid the investigation into her attacker, Rinearson blames the lack of cooperation from "those who live in the heavy crime areas" for "lives lost to gang slayings, drug-deals gone wrong, domestic disputes or street quarrels." Rinearson concludes by stating that "anti-police groups such as Black Lives Matter has [sic] found an effectual ally" in the criminals that commit violent acts. (ECF No. 38-6).

Rinearson's writings were well-known among his co-workers at FWCS. John Weicker, FWCS' Security Director until his retirement in 2013, testified that he had personally discussed Rinearson's columns with Cammack and Stockman, and that it was common knowledge that Rinearson was writing the articles. According to Weicker, "I don't know what planet you'd be on that you didn't know he wrote the articles, quite frankly." Similarly, Stockman confirmed that she has discussed Rinearson's articles with Cammack, and she also admits that Rinearson's writings were common knowledge among FWCS' administrators.

There is reason to believe that Robinson was among the people who were aware of Rinearson's political viewpoints. Part of Stockman's job was to read every local newspaper and to report to Robinson "anything that is in there that is connected to anyone" at FWCS. Robinson admitted that she was aware of Rinearson's writings because Stockman told her about them. Robinson also conceded that Stockman may have told her that the articles were critical of President Obama and Black Lives Matter.

The political tone of Rinearson's writings is important because his politics are at odds with his superiors. While Rinearson is a white conservative, Robinson, Cammack, Carr, and Jackson are all African-American liberals. Robinson in particular voted for President Obama in 2004 and 2008, and philosophically supported the Black Lives Matter movement. Robinson admits that she may have told Cammack that she did not approve of Rinearson's writings. Ultimately, it does not

7

appear to be genuinely contested that Robinson did not agree with the points of view exhibited in Rinearson's writings generally, or the 2017 writings specifically.

## LEGAL ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and

construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.      *Rinearson Cannot Establish a Violation of his First Amendment Rights***

1.      *Legal Standard for First Amendment Retaliation*

The parties agree that the applicable law is set forth in the Seventh Circuit's decision in *McGreal v. Village of Orland Park*, 850 F.3d 308 (7th Cir. 2017). To recover on his claim, Rinearson must show: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in FWCS' decision to take the retaliatory action. *Id*. at 312. The only dispute between the parties is on the third element.

At the summary judgment stage, First Amendment retaliation cases go through a burden shifting process. First, the plaintiff must produce evidence that his speech was "at least a motivating factor—or, in philosophical terms, a 'sufficient condition'—of the employer's decision to take retaliatory action against him." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (quoting *Greene v. Doruff*, 660 F.3d 975, 979–80 (7th Cir. 2011)). If the plaintiff makes this initial showing, the burden then "shifts to the employer to rebut the causal inference." *Id*. The employer can meet its burden by offering an alternative explanation for the firing, showing that its decision to terminate the plaintiff "would have been made in the absence of the protected speech." *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012). If the employer successfully rebuts the causal inference, the burden shifts back to the plaintiff to "demonstrate that the [employer's] proffered reason was pretextual and that the real reason was retaliatory animus." *Id*. "[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie,

9

specifically a phony reason for some action.'" *Burton v. Bd. of Regents*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cty. Sheriff's Dep't.*, 799 F.3d 857, 864 (7th Cir. 2015)).

For this Opinion, the Court will assume that the first two stages of the burden shifting process have been satisfied. Plaintiff has submitted sufficient evidence for a preliminary showing that Robinson[3] was aware of his writings and had some amount of animosity towards them. In response, the Court concludes that FWCS has offered an alternative explanation for the firing, that being the May instance of alleged mistreatment of a student. Therefore, the sole remaining issue is whether the designated evidence demonstrates that FWCS' proffered reason was pretextual and that the real reason was retaliatory animus.

2. *Rinearson's Arguments for Pretext*

Rinearson has submitted multiple arguments to the Court in support of his claim that his treatment of students was pretext for his firing. The Court has reviewed each and finds none of them compelling. Addressing each argument in turn:

a. Shifting Reasons

Rinearson first asserts that FWCS has changed the reason for his firing. He claims that the initial reason for his termination was his "inappropriate physical restraint" of the nine-year old girl on May 25, 2017, and that his "verbal abuse" of the student was not raised until after he was terminated.

---

[3] There is no discussion in either parties' briefs as to whether Robinson had "final policymaking authority" with respect to Rinearson's firing, such that FWCS could be held liable under *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). It appears from FWCS' brief that the school board made the final decision to terminate Rinearson, and there is no discussion whatsoever as to whether those individuals were aware of Rinearson's writings. Moreover, Indiana law vests employment decision-making authority with the superintendent, subject to the approval of the governing body. *See* Ind. Code § 20-26-5-4.5(a). However, since neither party addresses this issue, and since a determination of this issue is unnecessary for the purposes of this Court's Opinion and Order, the Court will assume that Robinson had final policymaking authority in this instance.

Shifting and inconsistent explanations for termination can provide a basis for a finding of pretext. *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003). However, "the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Id*. Where the basis for termination is consistent "in substance if not word choice," no inference of pretext arises. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).

Here, FWCS' stated basis has always been the same: the May 25, 2017, incident with the little girl. While FWCS has described the incident differently, there has been no substantive change in FWCS' rationale. In fact, the suspension letter sent to Rinearson on May 25, 2017, generally described the basis for his suspension as his "alleged inappropriate conduct/interaction with a student." (ECF No. 38-17). Nothing about that letter limits the basis for termination to only physical contact. Therefore, this Court concludes that the reason for Rinearson's termination has not been so shifting and inconsistent as to give rise to an inference of pretext.

b.  School District Policies

Rinearson next asserts that FWCS' stated basis for termination must be pretext because his actions on May 25, 2017, were not contrary to FWCS' policies. In support of this assertion, Rinearson submits nine different affidavits, including his own, testifying that his conduct during both the March and May incidents was appropriate.

This argument "assumes that this court concerns itself with the propriety of business decisions." *Gusewelle v. City of River Wood*, 374 F.3d 568, 576 (7th Cir. 2004). It does not. The Court does not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision. Our only concern is whether the legitimate reason provided by the employer is in fact the true one." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Thus, the relevant factual inquiry is not whether Rinearson actually violated FWCS'

policies, but whether the decision makers believed he had. *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1056 (7th Cir. 2006). The fact that Rinearson's co-workers, subordinates, and former supervisors thought his actions appropriate is beside the point, as they were not charged with the responsibility of monitoring his work performance. *Id*.

While Rinearson's evidence may raise a genuine issue of material fact as to whether his conduct was wrongful, it does not raise such an issue regarding his superiors' beliefs. Instead, all of the evidence from his supervisors demonstrates that they believed that Rinearson's conduct was improper and in violation of FWCS' policies. Thus, whether his conduct was *actually* inappropriate, and whether he *actually* violated FWCS' policies, is irrelevant. Accordingly, none of Rinearson's evidence on this point is relevant to the issue of pretext.

c.     Lack of a Warning After the March 16, 2017, Incident

Rinearson makes much of the fact that he did not receive a warning after the March 16, 2017, incident. According to Rinearson, he was not aware that he allegedly received a warning about his conduct until the December 11, 2017, Preliminary Pre-Trial Conference in this matter when counsel for FWCS represented that such a warning had been given. Rinearson asserts that the dispute regarding the warning is evidence of pretext.

First, counsel's statement cannot form the basis for a finding of pretext. *Harris v. Office of the Chief Judge of the Cir. Ct. of Cook Cty.*, 673 Fed. Appx. 537, 541 (7th Cir. 2016) (stating that "defendants' litigation conduct, even if evasive, says nothing about the authenticity of their stated reasons for disciplining him."). Second, Plaintiff fails to demonstrate how a dispute over the existence of a warning is relevant to the issue of pretext. FWCS has never suggested that the March 16, 2017, incident was the reason for his termination. That incident is not referenced in his suspension or termination notices. (*See* ECF Nos. 38-3, 38-17). Moreover, Rinearson has not

designated any kind of progressive discipline policy that would have required FWCS to give him a warning prior to termination. Therefore, while the parties dispute the existence of a warning, that dispute is irrelevant to the issue of pretext.

d.      Rinearson's History of Similar Conduct

Next, Rinearson asserts that the May 25, 2017, incident could not have been a legitimate reason for his termination because his conduct "was the same as he had been doing for years." (ECF No. 38 at 20). As frightening as this statement may be, it is irrelevant to the issue of pretext. Simply because FWCS overlooked Rinearson's conduct in the past does not mean that their refusal to do so in this case was pretextual. *See*, *e.g.*, *Choate v. Nat. R. R. Passenger Corp.*, 132 F. Supp. 2d 569, 573 (E.D. Mich. 2001) (lack of prior discipline for excessive absenteeism not evidence of pretext); *Hendricks v. Mid-Amer. Pipeline Co.*, 985 F. Supp. 1024, 1031 (D. Kan. 1997). That FWCS may have had grounds to fire Rinearson earlier does not render its choice to do so in 2017 a pretext for discrimination.

e.      Suspicious Timing

Rinearson next asks the Court to consider the timing of the discipline; his suspension came only three days after the publication of his May 22, 2017, article critical of Black Lives Matter. To be sure, suspicious timing can be circumstantial evidence of pretext, especially where the time period between the protected activity and the adverse action are "very close." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). Three days would certainly qualify. However, where a "significant intervening event" separates the protected activity from the adverse employment action, a suspicious timing argument cannot prevail. *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (citing *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)). Here, Rinearson's interaction with the nine-year-old girl on May 25, 2017, the stated

reason for his termination, separated his column from his suspension. Thus, the short time period here cannot establish pretext.

f.      Discipline of Comparable Employees

Finally, Rinearson argues that FWCS has a "long history of other administration/classified employees who engaged in conduct more serious than Rinearson who were not terminated by FWCS." (ECF No. 38-2 at 28). In support of this argument, Rinearson provides six examples of FWCS employees, all but one of whom were disciplined for inappropriate physical contact, who were not terminated. (*Id*. at 28–31).

To survive summary judgment "by showing differential treatment of a similarly situated employee, a plaintiff must identify a comparator who is 'directly comparable to [him] in all material respects.'" *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 626 (7th Cir. 2016) (quoting *Perez v. Thortons, Inc*., 731 F.3d 699, 704 (7th Cir. 2013)). "The goal of the comparison analysis is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable–discriminatory animus." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (internal quotation marks and citation omitted). A "difference in job title alone is not dispositive" where comparators' similarities nonetheless predominate. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007). Typically, a plaintiff needs to show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Gates v. Caterpillar, Inc*., 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citation omitted).

Rinearson's proposed comparators fail to meet the requirements that they be directly comparable in all material respects. None of his comparators worked in the transportation department at FWCS, and therefore they would not have had the same supervisor as Rinearson. Rinearson has also failed to establish that these individuals would have been subject to the same standards of conduct. In addition, at least three of the proposed comparators deal with conduct that is a decade or more in the past. "The older the comparator case, the more likely the difference in treatment was due to changes in policies, personnel, and attitudes over the intervening years." *Coleman v. Robert W. Depke Juvenile Justice Ctr.*, 2018 WL 1468999, at *8 (N.D. Ill. March 26, 2018).

FWCS, on the other hand, offers three far more comparable examples of employee discipline. (ECF No. 31 at 12–13). Each of FWCS' comparators worked in the transportation department, and all are within the last ten years. In each of those incidents the employee was either terminated or resigned as a result of inappropriate contact with a student, even where the employee claimed the contact was unintentional. The Court finds that FWCS' examples meet the legal test for applicable comparators and demonstrate a lack of pretext in Rinearson's firing.

In summary, none of Rinearson's proffered arguments can change the inescapable conclusion that he was fired for verbally assaulting and physically contacting a child rather than writing another conservative newspaper column. Rinearson has failed to demonstrate that FWCS' stated reason for his termination was pretext, and his claim cannot survive summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 30) is GRANTED. The Clerk will enter judgment in favor of Defendant and against Plaintiff.

SO ORDERED on June 25, 2019.

                                              s/ Holly A. Brady
                                              JUDGE HOLLY A. BRADY
                                              UNITED STATES DISTRICT COURT